# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION


UNITED STATES OF AMERICA

-vs-                                                     Case No.:  2:08-cr-100-FtM-29SPC

JAMES ALLEN BARNETT

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Defendant's Motion to Suppress Evidence and Memorandum of Law (Doc. #21) filed on October 31, 2008.  The Government filed the Government's Response to Defendant's Motion to Suppress Evidence and Incorporated Memorandum (Doc. #23) on November 12, 2008.  A hearing was scheduled for December 1, 2008, however it was continued.  A hearing was held before the undersigned on December 12, 2008.  The Defendant was present and represented by Assistant Federal Public Defender Russell Rosenthal.  The Government was represented by Assistant United States Attorneys David Haas and Simon Gaugush.  The Government called two witnesses: Bryan Enderle and Steven Harris and introduced two (2) exhibits: the video tape of the traffic stop, and a composite exhibit of certifications and records.  The Defendant called five (5) witnesses: Tiffany Renee Buchanan, Timothy Vanscultz, Samikia Cleosha Mike, Nickenya Fayth Bryant, and Corrado Lazzizzera and introduced a number of exhibits including photographs of the vehicle and other documents.  On December 30, 2008, the Government filed supplemental materials in regard to K-9 certifications. (Doc. #47).  On January 6, 2009, the

parties advised the Court they would not need any additional hearing time based upon the supplemental submission. Therefore, the issues raised in the Defendant's Motion to Suppress are now ripe for review.

## EVIDENCE AND TESTIMONY

### Bryan Enderle (Tr. 5-122):

Bryan Enderle ("Enderle") is currently employed with Applied Aquatics. (Tr. 5:6-7). On May 3, 2008, Enderle was employed with the Glades County Sheriff's Office (GCSO) and had been employed there for approximately five (5) years. (Tr. 5:8-13). He was employed as a K-9 handler for approximately two and a half to three years but also performed the functions of patrol deputy, as well as working in the criminal investigations narcotics division. (Tr. 5:14-21).

Enderle was the dog handler for Nero, a Belgian Malinois. (Tr. 5:22-25, 6:1-4). He received special training as a team with Nero who was a dual purpose narcotics detection dog and criminal apprehension dog. (Tr. 6:15, 7:5-7). Nero was trained to detect marijuana, cocaine, methamphetamines, and heroin. (Tr. 7:8-9). Much of the training was scenario and hide based. [1] (Tr. 7:10-13). Nero was a passive alert dog which meant that he would sit down, lay down, or stare at the area in which he found the narcotics. (Tr. 9:22-23). He would also alert to narcotics by looking back and forth between the handler and the narcotics. (Tr. 10:9-12). When narcotics was detected, there would be a change in behavior in the dog such as heavy or rapid breathing. (Tr. 10:16-20). You could often hear the dog smelling and his body posture would stiffen up, or he may jump up and start smelling certain areas. (Tr. 10:18-221).

---

[1] Nero participated in interior vehicle hides, exterior vehicle hides, and open area hides. (Tr. 7:15-17).

Enderle and Nero received their initial training and certification in Indiana and then returned to Florida and began working as a team. (Tr. 11:4-13). They had follow-up training as a team every two weeks to once a month with other K-9 handlers and instructors. (Tr. 11:18-21). Enderle and Nero were also certified annually by the Police Work Dog Association of Florida.[2] (Tr. 12:4-11). The Government introduced Nero's various certifications, training records, and training logs as part of their presentation of the evidence. (Govt. Ex. #2). Supplemental records were also obtained and provided to the Court. (Doc. #47). The K-9 certifications are good for one year, however, GCSO requires their K-9 officers to be certified annually. (Tr. 18:15-17).

Enderle testified that Nero had a problem with certification on one occasion. (Tr. 18:24-25, 19:1-4). During the course of an open area hide in a tow company's auto yard, Nero did not locate or show an interest in two of the hides that were placed. (Tr. 19:5-10). Enderle testified that a cat ran in front of him while they were doing the certification. (Tr. 19:12-13). The test was redone, and Nero was able to find all of the hides and was certified. (Tr. 19:16-19). As part of his training as a law enforcement officer, Enderle received training in highway interdiction and advanced vehicle concealment compartments as well as search and seizure. (Tr. 20:8-13).

During the two and a half years that Enderle worked with Nero, he would utilize Nero from two (2) to five (5) times a week to do open air sniffs. (Tr. 20:16-25, 21:1). During that period of time, Nero alerted on approximately a half dozen occasions to drugs being in a particular area yet no drugs were found. (Tr. 21:15-20). However, on those occasions, Enderle was able to determine

---

[2]Nero was certified in 2007 and 2008 by the Police Work Dog Association of Florida in the detection of marijuana, cocaine, methamphetamines, and heroin.

that drugs had been located in those areas by speaking with the driver or occupants of the vehicle. (Tr. 23:5-6).

On May 3, 2008, Enderle was working with Nero doing traffic enforcement on U.S. 27. (Tr. 26:23-25, 27). A video camera was installed in the police car that he was using on that day. (Tr. 27:16-18). Although there was an interdiction operation in progress that day, Enderle was not part of the operation but was working his regular shift. (Tr. 66:14-25). However, he was aware that vehicles were being pulled over as part of the interdiction. (Tr. 72:24-25, 73:1-4). On that evening, Enderle conducted a traffic stop on a 1998 Lincoln traveling on U.S. 27. (Tr. 29:3-4). The Defendant was identified as the driver of the vehicle. (Tr. 29:6-7). The sole passenger in the vehicle was William Harris. (Tr. 29:20-25, 30:1). The traffic stop was video taped. (Tr. 30:2-4)(Gov. Ex. #1).

Enderle pulled the vehicle over because of an apparent window tint violation. (Tr. 31:4-8). He explained that the windows were dark and non-transparent and that he could not see the occupants of the vehicle. (Tr. 31:9-12). As Enderle approached the rear door of the vehicle, he smelled a strong odor of marijuana coming from the open driver's window. (Tr. 34: 10-22). He tested the driver's side front window and the driver's side passenger door window tint using a tint meter. (Tr. 34:23-25, 36:9-12). The driver's side window was within legal limits, however, the driver's side rear passenger door tested at 12 percent (12%) which is below the legal limit of 15 percent (15%). (Tr. 36:17-19, 75:5-20). He had previously tested the tint meter for accuracy that day prior to the beginning of his shift and found it to be in good working order. (Tr. 37:8-15). He gave the Defendant a non-moving citation for the tint violation. (Tr. 38:3-7).

After the Defendant exited the vehicle, Enderle asked him about his trip itinerary to which the Defendant responded that he was "going to Clewiston for a festival." (Tr. 39:20-24). Enderle called for back up because he was going to search the vehicle based upon the smell of marijuana when he walked up to the vehicle. (Tr. 40:23-25, 41:1-3).

Detective Sergeant Steve Harris ("Det. Sgt. Harris") arrived as back up and Enderle asked him to stand by while he searched the vehicle. (Tr. 41:19-25). Enderle patted down William Harris, the occupant of the vehicle. (Tr. 42:22-25, 43:1-2). After the occupants were removed from the vehicle, Enderle brought Nero to the vehicle and started a search. (Tr. 44:2-5). He first had Nero detail the seams of the vehicle giving him the opportunity to smell any odor that may be coming from the vehicle. (Tr. 44:6-16). Although Enderle felt that he could search the vehicle based upon the smell of marijuana coming from the vehicle, he used Nero because he was present, and because Nero would give him the opportunity to locate any potential hidden compartments or concealed contraband in the vehicle. (Tr. 44: 17-25, 45:1-5). Nero showed interest in the passenger's side door handle and the passenger's side bottom door seam. (Tr. 45:11-15).[3] When Nero was allowed inside the vehicle, he gave a positive alert in the area of the passenger's side seat, between the seat and the console area, and in the general area of the head liner of the vehicle. (Tr. 47:3-6). No drugs were located in the vehicle. (Tr. 47:13-16). However, marijuana was found on the passenger, Harris during a pat down search after he was removed from the vehicle. (Tr. 47:17-21). The Defendant was also searched during the traffic stop and marijuana was located on his person. (Tr. 48:3-7).

---

[3]Nero jumped up to the passenger side door handle, smelled it, went down to the bottom seam of the passenger's side door. His breathing got rapid, shallow. You could hear him smelling at a rapid, rapid pace and had slowed way down and paid a lot of attention to that door seam. (Tr. 45:18-22).

During the course of the search of the vehicle, Enderle located a silver, metal, .45 pistol under the driver's seat. (Tr. 49:8-13). The Defendant was placed under arrest. (Tr. 50:10-13). After conducting a search of the passenger's side of the vehicle, another firearm was located. (Tr. 51:7-22).

On cross examination, counsel inquired of Enderle's past law enforcement experience. Enderle, prior to working with the GCSO was a corrections officer at Moore Haven Correctional and also worked at Okeechobee County Sheriff's Office. (Tr. 55:2-15). Enderle admitted that he had been terminated from Moore Haven Correctional due to an arrest regarding an assault and a disorderly conduct. (Tr. 56:4-8). He was placed on probation for those offenses. (Tr. 56:10-14). He was also convicted in Osceola County for discharging a firearm and was placed on probation. (Tr. 61:1-10). On his Glade's County application, Enderle merely noted that he was previously arrested for taking a deer at night. (Tr. 65:13-19).

**Steven Harris (Tr. 123-169):**

Steven Harris is employed with the GCSO as a Detective Sergeant in the narcotics and criminal investigations units and has been so employed for the past nine (9) years. (Tr. 123:6-13). During the course of his law enforcement experience, he was a K-9 handler for seven (7) years. (Tr. 125:17-19). On May 3, 2008, Det. Sgt. Harris was assisting in the interdiction operation. (Tr. 126:23-25, 127:1-10). Det. Sgt. Harris indicated that Enderle was not a part of the interdiction plan on that day. (Tr. 127:19-24).

When Det. Sgt. Harris arrived at the Defendant's traffic stop, he made contact with the Defendant and the Co-Defendant. (Tr. 131:2-9). As he was standing by with the Defendants, and as Enderle approached the Defendant's vehicle, Defendant Barnett made a statement that Enderle

was not going to find anything, "We already smoked it, it's all gone." (Tr. 132:21-25, 133:1). Det. Sgt. Harris could smell the "tremendous" odor of burnt marijuana originating from the vehicle area. (Tr. 133:7-11). He could also smell the marijuana coming from the Defendants. (Tr. 133:12-15).

Det. Sgt. Harris observed Enderle remove a firearm from underneath the Defendant's seat. (Tr. 134:21-24). At that time, Defendant Barnett said "It's my gun, my partner's got nothing to do with it." (Tr. 136:1-2). Det. Sgt. Harris told the Defendant to refrain from saying anything more and then advised him of his rights per <u>Miranda</u> from a card. (Tr. 136:3-4, 17-20). The Defendant indicated he understood his rights - "I know them well." (Tr. 138:6-7). He also indicated when asked if he was willing to speak with him, "Yes, I will." (Tr. 159:13-22). Det. Sgt. Harris asked him about the gun. The Defendant said that he was going to the festival in Clewiston and felt that he needed it for protection. However, the Defendant indicated that when he saw the cops on the road, he should have thrown it out the window. (Tr. 138:10-15). Prior to transport, Defendant Barnett indicated that he had a partially smoked joint in his groin area which was retrieved by Det. Sgt. Harris. (Tr. 140:19-20).

Det. Sgt. Harris testified that he knew May 3, 2008 was one of the days of the Brown Sugar Festival held in the Harlem Academy area of Clewiston. (Tr. 143:20-21, 144:23-25). He testified that the majority of the individuals who attend the festival are primarily African-American. (Tr. 145:1-5). The purpose of the interdiction operation was to write traffic tickets for traffic violations and narcotics interdiction. (Tr. 146:9-19). As part of the interdiction, traffic stops were conducted on approximately 250 to 300 cars. (Tr. 166:25, 167:1). He and his partner made approximately 25 stops. (Tr. 166:11-12).

**Tiffany Buchanon (Tr. 170 - 181):**

Tiffany Buchanon resides in Sarasota and is the girlfriend of the Defendant, James Barnett. (Tr. 170:6-12). She has known the Defendant for approximately 15 years and has been his girlfriend for approximately 11 years. (Tr. 176:8 - 12). They have one child together. (Tr. 176:13-17). .She is the owner of the 1998 Lincoln Town Car the Defendant was driving at the time of the traffic stop. (Tr. 170:13-15). She testified as to the appearance of the vehicle on May 3, 2009 specifically as to the paint and the tint. The Defense introduced a number of photographs of the vehicle depicting the tint which was installed on the car in 2006. (Tr. 172:9-11) (Def. Ex.'s A-1 thru A-4) .

Buchanon testified that she was stopped in Sarasota on September 3,2008, in the same vehicle. (Tr. 173:17-25). Although she received five (5) citations during the traffic stop, she did not receive a citation for a tint violation. (Def. Ex. D Composite). Buchanon is classified as a habitual traffic offender and has been convicted of "about three" felonies. (Tr. 176:20-25, 177:1-7).

**Timothy Vanschultz (Tr. 182 - 184):**

Timothy Vanschultz ("Officer Vanschultz") is an officer with the City of Sarasota Police Department. (Tr. 182:15-16). Ofc. Vanschultz stopped Tiffany Buchanon on September 3, 2008. (Tr. 17-20). At the time of the traffic stop, five (5) citations were issued. He checked the tint on the 1998 Lincoln she was driving but did not write a citation for any tint violation. (Tr. 183:15-25, 184:4-8).

**Samikia Mike (Tr. 185 - 193):**

Samikia Mike("Mike") resides in Auburndale, Florida. (Tr. 185:22-23). Mike was stopped by law enforcement on May 3, 2008, while traveling on U.S. 27 heading to the Brown Sugar Festival in Clewiston. (Tr. 186:7-15, 189:2). She was driving a rental car at the time of the stop. (Tr.

189:22). She was stopped because the tint was too dark on the vehicle. (Tr. 190:4-6). Mike is an African-American. (Tr. 190:14-16). She was cited and pled guilty to a marijuana offense. (Tr. 191:13-16). She previously was convicted of a battery and a marijuana offense. (Tr. 192:19-25, 193:1-4). On cross examination she indicated that she was trailing someone else in another vehicle and pulled over because they were pulled over. (Tr. 193:7-14). The officer then approached and told her that her tint was too dark. (Tr. 193:7).

**Nickenya Bryant (Tr. 194 - 198):**

Nikenya Bryant ("Bryant") resides in Lakeland, Florida. (Tr. 194:18-19). On May 3, 2008, she was heading to Clewiston for the Brown Sugar Festival. (Tr. 194:24-25, 195:1-2). She was riding in the car with Mike. (Tr. 195:13). Her brother was driving her vehicle which she bought used from a dealership prior to May 3, 2008. (Tr. 195:20-25, 196:1-8, 197:22-23). Her brother was stopped for a tint violation but released. (Tr. 196:18-20). About five (5) or six (6) miles down the road, he was stopped again. (Tr. 196:21-25). Marijuana was located in the vehicle. (Tr. 197:1-8). Bryant is an African-American. (Tr.197:9-10).

**Corrado Lazzizzera (Tr. 199 - 212):**

Corrado Lazzizzera ("Inv. Lazzizzera") is an investigator for the Federal Public Defender's Office and has served in that capacity for approximately two (2) years. (Tr. 199:13-17). Prior to that, he served as an investigator for the State Public Defender and a probation officer for the Department of Corrections. (Tr. 199:20-25).

Inv. Lazzizzera took photographs of the 1998 Lincoln. (Def. Ex's. A-1 thru A-4). As part of this investigation, he obtained a tint meter of the same model that Enderle used in his traffic stop. (Tr. 201:7-22). Photographs of the tint meter's results with respect to the window on the driver's

side of the vehicle were introduced.  (Defendant's Ex's B-1 thru B-2). The reading for the front window was 37with the legal limit being 28.  (Tr. 203:3-9).  With respect to the rear passenger side window of the vehicle, the reading was 14 with the legal limit being 15.  (Tr. 203:14-25, 204:1-2). The manual for the tint meter indicates a margin of error of plus or minus two percent (2%).  (Tr. 204:6-10, Def. Ex. C).

Inv. Lazzizzera went to the Glades County Clerk's Office and attempted to locate any stops of people that were either arrested or cited near the location where the Defendant was stopped on May 3, 2008.  (Tr. 205:20-25, 206:1- 6).  He located six (6) where arrests or citations were made. (Tr. 206:7-10).  Of the six (6) arrests, five (5) were of African-Americans and all were heading southbound on U.S. 27.  (Tr. 208:16-25). Five (5) of the six (6) were stopped for tint violations.  (Tr. 209:3-5).  He did not follow up to see whether or not the tint on any of those vehicles was, in fact, legal or illegal.  (Tr. 211:23-25, 212:1).  Inv. Lazzizzera did not pull citations, only police reports for that time period.  (Tr. 207:9-16).

## DISCUSSION

The Defendant argues the evidence should be suppressed because (1) the initial stop of the vehicle was unlawful; (2) the subsequent detention of the Defendant was unlawful and the search was the product of the illegal detention; (3) there was no probable cause for the search of the vehicle; and (4) any statements made by the Defendant were obtained in violation of his rights pursuant to Miranda v. Arizona.  The Government counters that the stop, detention, search and questioning of the Defendant were lawful and, as a result, requests the evidence obtained by law enforcement be admissible during trial.

*(1) Whether the Search was Reasonable*

"It is well-settled that the Fourth Amendment prohibits 'unreasonable searches and seizures' by the government, and its protections extend to brief investigatory stops of persons or vehicles that do not amount to a full, traditional arrest." U.S. v. Williams, WL 1540287, *4 -5 (M.D. Fla. May 31, 2006) (quoting Terry v. Ohio, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968); U.S. v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed.2d 621 (1981). The Fourth Amendment is satisfied if the officer's actions are supported by reasonable suspicion to believe that criminal activity "may be afoot." Terry, 392 U.S. at 30. "Reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. Illinois v. Wardlow, 528 U.S. 119, 123-24, 120 S.Ct. 673, 145 L. Ed.2d 570 (2000). However, the Fourth Amendment requires at least a minimal level of objective justification for making the stop; the officer must be able to articulate more than an "inchoate and unparticularized suspicion or hunch" of criminal activity. Id. (citing U. S. v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed.2d 1 (1989); Terry, 392 U.S. at 27)); Cortez, 449 U.S. at 417.

In making a reasonable suspicion determination, the court must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. U.S. v. Arvizu, 534 U.S. 266, 273-74, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002) (citing Cortez, 449 U.S. at 417-18). This process allows officers to draw on their own experience and specialized training to make inferences from, and deductions about, the cumulative information available to them that "might well elude an untrained person." Arvizu, 534 U.S. at 273-74 (quoting Cortez, 449 U.S. at 418, and citing Ornelas v. U.S., 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed.2d 911 (1996)).

In <u>Terry v. Ohio</u>, the Court adopted "a duel inquiry for evaluating the reasonableness of an investigative stop." <u>U.S. v. Sharpe</u>, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed.2d 605 (1985);<u>U.S. v. Acosta</u>, 363 F.3d 1141, 1144 (11th Cir.2004). By this approach, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." <u>Sharpe</u>, 470 U.S. at 682. Whether an officer's actions were justified at the inception "turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime." <u>Acosta</u>, 363 F.3d at 1144-45. In the second part, the court looks to whether the stop was related in scope to the circumstances which justified the stop in the first place. <u>Id.</u>

*(a) Initial Stop*

Florida law allows an officer to stop a vehicle in instances where the officer believes the vehicle's window tinting is too dark. <u>State v. Moore</u>, 791 So. 2d 1246 (Fla. 1st DCA 2001). Based upon his experience at stopping vehicles with tinted windows, Enderle believed the Defendant's window tinting was too dark under Florida's law. After the Defendant pulled over, Enderle measured the Defendant's vehicle's window tint. Enderle tested the driver's side front window and the driver's side passenger door window tint using a tint meter. (Tr. 34:23-25, 36:9-12). The driver's side window was within legal limits, however, the driver's side rear passenger door tested at 12 percent (12%). (Tr. 34:23-25, 36:9-12).

Under Florida law, a vehicle's back windows must allow light transmittance at no less than fifteen percent (15%), here Enderle received a twelve percent (12%) reading on his tint meter which was a violation of the Florida statute. *See* <u>U.S. v. Weaver</u>, 145 Fed. Appx. 639, 641 (11th Cir. 2005)

(*citing* Fla. Stat. § 316.2953, holding that a traffic stop was supported by probable cause where the officer believed the vehicle's window tinting was in violation of Florida's legal limits).

The Defendant argues that Enderle failed to comply with the directives given for the traffic interdiction scheduled for that day. According to the standing order for the traffic interdiction planned for May 3, 2008, the officers were told to take a photo of any tint meter readings that were too dark under the Florida statute. (Tr.147:9-14). Enderle did not take a photo of the reading he got on the Defendant's vehicle. (Tr.71:2-3). However, according to Enderle and Det. Sgt. Harris, Enderle was not a part of the interdiction operation but was rather on routine patrol in his assigned area. (Tr. 66:14-25, 127:19-24). Therefore, Enderle was not under the operational order given to the officers participating in the interdiction.

Although the Defendant's investigator took photos of the car windows which showed the windows were somewhat transparent and the interior of the vehicle was visible through the window, the photos were taken at an earlier time in the day with the vehicle doors open. These factors allow more light transmittance than when the doors are closed and when it is dusk.(Def. Ex. A,1-4). Moreover, Enderle's tint meter reading was confirmed by the Defendant's own investigator who measured the back window tinting and received a reading of fourteen percent (14%). (Tr. 203:14-25, 204:1-2). The tint meter's margin of error is plus or minus two percent (2%). (Tr. 204:6-10, Def. Ex. C). The Defendant's and Dep. Enderle's readings were within each meter's margin of error. Thus, even based upon the results of the Defendant's own investigation, there was evidence the Defendant had committed a traffic violation and the initial traffic stop was justified.

The Defendant also presented evidence that his girlfriend, Tiffany Buchanon was stopped in Sarasota driving the same vehicle after this alleged incident. Buchanon testified that she was

stopped in Sarasota on September 3, 2008, in the same vehicle. (Tr. 173:17-25). Although she received five (5) citations during the traffic stop, she did not receive a citation for a tint violation. (Def. Ex. D Composite, Tr. 183:15-25, 184:4-8). Buchanon is classified as a habitual traffic offender and has been convicted of "about three" felonies. (Tr. 176:20-25, 177:1-7).

The decision to issue a tint violation is left up to the officers discretion. The Court cannot second guess what another officer did on another day regarding a separate violation. However, it is clear in this case that Enderle's tint meter registered a violation of Florida law and the violation was later confirmed by the Defendant's own investigator. Thus, the Defendant's argument that another driver on another day did not receive a tint violation is insufficient grounds to suppress the evidence.

### (b) Reasonable Belief of Criminal Activity

The Supreme Court has held that if there was probable cause to search a vehicle, a warrantless search would not be deemed a violation of the Fourth Amendment if the facts of the case would have justified a warrant even through a warrant was not actually obtained. U.S. v. Ross, 456 U.S. 798, 809, 102 S. Ct. 2157, 2152 (1982). "While it is true that the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search, there is what has become known as the automobile exception to the warrant requirement." U.S. v. Watts, 329 F.3d 1282, 1284 (11th Cir. 2003). The automobile exception holds that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Id. at 1285 (citing Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485 (1996). No special exigency is required beyond a showing that the vehicle is mobile. Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013 (1999) (per curiam). The Supreme Court

has held that if there was probable cause to search a vehicle, a warrantless search would not be deemed a violation of the Fourth Amendment if the facts of the case would have justified a warrant even through a warrant was not actually obtained. U.S. v. Ross, 456 U.S. 798, 809, 102 S. Ct. 2157, 2152 (1982).

Enderle smelled a strong odor of marijuana emanating from the vehicle's interior as he approached the driver's side. (Tr. 34:10-22). The smell of marijuana emanating from a vehicle gives an officer probable cause to search a vehicle without a warrant. U.S. v. Griffin, 109 F.3d 706, 708 (11th Cir. 1999) (holding that an officer has good reason justifying a warrantless search of a vehicle when he smells the strong odor of marijuana coming from the vehicle as he approaches the vehicle); State v. Bennett, 481 So. 2d 971, 972 (Fla. 5th DCA 1986)(holding that the smell marijuana emanating from a vehicle gives an officer probable cause to search a vehicle without a warrant). The testimony of Det. Sgt. Harris supports Enderle's testimony as he also testified that he could smell the "tremendous" odor of burnt marijuana originating from the vehicle area. (Tr.133:7-11).

The physical evidence found on the Defendant and the passenger also supports Enderle's testimony. Prior to transport, Defendant Barnett indicated that he had a partially smoked joint hidden in his groin area which was retrieved by Det. Sgt. Harris. (Tr. 140:19-20). Marijuana was found on the passenger, Harris, during a pat down search after he was removed from the vehicle. (Tr. 47:17-21). It is undisputed that the vehicle was mobile at the time of the traffic stop. The fact that the vehicle was mobile and both Enderle and Det. Sgt. Harris smelled the odor of marijuana coming from the vehicle is sufficient to justify the warrantless search of the vehicle.

<u>*(2) Whether the Detention of the Defendant was Unlawful*</u>

The Defendant argues that the search of the vehicle was the result of an unlawful and unreasonable detention. The Defendant claims that he was detained beyond the permissible scope of the traffic stop. Once the purposes of the initial traffic stop are completed the officer cannot further detain a vehicle or its occupants unless something occurred during the traffic stop that created a reasonable suspicion to justify further detention. <u>U.S. v. Holloman</u>, 113 F.3d 192, 196 (11th Cir. 1997) (citing <u>U.S. v. Mesa</u>, 62 F.3d 159, 162 (6th Cir. 1995).

In this instance, Enderle smelled the odor of marijuana emanating from the Defendant's vehicle. (Tr.34:10-22). Once Enderle smelled the odor of marijuana, a reasonable suspicion justifying further detention occurred. <u>Holloman</u>, 113 F.3d at 196. Enderle was a K-9 officer and had Nero in his car, thus, there was no delay in waiting for a canine to arrive and perform a free air sniff of the Defendant's vehicle. The time taken to perform a free air sniff was entirely reasonable given the fact that Enderle smelled a strong odor of marijuana emanating from the vehicle.

Regarding the length of the stop, based upon the video recording from Enderle's patrol car, the entire incident from the time of the stop, the arrival of Det. Sgt. Harris about nine and a half minutes (9½) into the stop , the free air canine sniff by Nero, the search, and the eventual arrest of the Defendant, took approximately thirty-five minutes. Courts have found that traffic stops that detain an individual between twenty to thirty minutes are reasonable. <u>U.S. v. Hardy</u>, 855 F.2d 735, 757 (11th Cir. 1988) (holding that twenty- eight (28) minutes is not an unreasonable detention for a traffic stop); <u>U.S. v. Williams</u>, 784 F. Supp. 1553, 1559 (M.D. Fla. 1991) *aff'd,* 978 F.2d 721 (table) (11th Cir. 1992) *cert. denied,* 507 U.S. 946 (1993) (holding that a twenty (20) minute detention for a traffic stop was reasonable). Given the detention was within the time frame courts

have found to be reasonable, and given both Enderle and Det. Sgt. Harris smelling marijuana emanating from the vehicle, the detention was neither delayed too long nor unreasonable.

Therefore, it is respectfully recommended that any delay in the stop was reasonable based upon the smell of marijuana, and the actual time of the stop to the time of arrest of the Defendant was well within the time frame considered reasonable by the Courts.

### (3) Whether the Dog Sniff was a Valid Search

Although this Court respectfully recommends that the search of the vehicle and subsequent seizure of the firearms was valid based upon Enderle smelling marijuana emanating from the Defendant's vehicle, the Court will examine the issue of the K-9 open air sniff. It is well established that a sniff by a drug dog does not constitute a search within the meaning of the Fourth Amendment. Holloman, 113 F.3d at 192. Therefore, reasonable suspicion is not needed before a drug detection dog may make a sniff of the exterior of the vehicle. Hearn v. Board of Public Educ., 191 F.3d 1329, 1332 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109 (2000). Furthermore, it is not disputed that the alert of a drug detection dog to a person's property can supply not only reasonable suspicion but probable cause to search property. Hearn v Board of Public Education, 191 F. 3d 1329, 1333 (11th Cir. 1999) *cert. denied.* 529 U.S. 1109 (2000).

The Defendant argues that the Government cannot rely on Nero's alert to establish probable cause to search the vehicle because the Government failed to establish Nero's reliability. On December 30, 2008, the Government supplemented the record with Nero's training certificates and training records from the Indiana Law Enforcement Training Academy. (Doc. # 47). In the United States v. Diaz, the Sixth Circuit set forth guidelines as the quality and quantity of evidence necessary to establish the reliability of a drug detection canine as follows:

> [w]hen evidence is presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the credibility of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability. As with the admissibility of evidence generally, the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sound discretion.

25 F. 3d 392, 394 (6th Cir. 1994) (internal quotations omitted).

Although the Eleventh Circuit has not extensively addressed the issue of a drug detection canine's reliability, the Court has found that training alone is sufficient proof of a dog's reliability. U.S. v Banks, 3 F.3d 399, 402 (11th Cir. 1993) (holding that probable cause arises when a drug-trained canine alerts to the presence of a narcotic); U.S. v. Sentovich, 677 F.2d 834, 837 n. 8 (11th Cir. 1982) (stating in dicta that the Eleventh Circuit follows the holdings of other circuits that training alone is sufficient proof of a canine's reliability)).

The training records certify that Nero and Enderle completed a 200 hour course in dual purpose narcotics detector dog and handler training. (Doc. # 47). The training completed by Nero and Enderle included training in sniff searched on the exterior and interior of a vehicle. (Doc. # 47). Enderle testified that Nero had a problem with certification on one occasion. (Tr. 18:24-25, 19:1-4). During the course of an open area hide in a tow company's auto yard, Nero did not locate or show an interest in two of the hides that were placed. (Tr. 19:5-10). Enderle testified that a cat ran in front of him while they were doing the certification. (Tr. 19:12-13). The test was redone, and Nero was able to find all of the hides and was certified. (Tr. 19:16-19). Enderle further testified that during the two and a half years that he worked with Nero, he utilized Nero from two (2) to five (5) times a week to do open air sniffs. (Tr. 20:16-25, 21:1). During that period of time, Nero alerted on

approximately a half dozen occasions to drugs being in a particular area yet no drugs were found. (Tr. 21:15-20). However, on those occasions, Enderle was able to determine that drugs had been located in those areas by speaking with the driver or occupants of the vehicle. (Tr. 23:5-6).

Thus, based upon Nero's training records and the testimony of Enderle, the Court respectfully recommends that Nero's alert to the presence of narcotics in the Defendant's vehicle was reliable. Banks, 3 F.3d at 402. As a result of the alert by a well-trained narcotics canine, Enderle had sufficient probable cause to search the Defendant's vehicle. Id. Consequently, the Court respectfully recommends there was sufficient probable cause to search the vehicle based upon Nero's alert. Furthermore, even if Nero had not alerted to the presence of narcotics in the vehicle, the odor of marijuana emanating from the vehicle gave the officer sufficient evidence to search the vehicle.

### (4) Whether the Defendant's Incriminating Statements Violated Miranda

Immediately upon Enderle's discovery of the firearm under the seat, the Defendant stated the gun was his and the gun did not belong to the passenger Harris. The Defendant argues that any incriminating statements made by himself were made in violation of his Fifth Amendment and Miranda rights. The Government argues the statements were voluntarily and freely made.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored

by either the officer or the Defendant. <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994) (*per curiam)*. A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. <u>Berkemer v. McCarty</u>, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

The Defendant argues that he was in custody at the time he made the statements regarding the firearm. Therefore, the Court must look to see if the Defendant was being interrogated or if he freely made or spontaneously told police the gun was his and that Passenger Harris had no knowledge the gun was in the car.

The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980). In this instance, the Defendant's statement was not made in response to any questions by either Enderle nor Det. Sgt. Harris. When Enderle emerged from the vehicle with the gun, the Defendant spontaneously stated the gun was his and that Passenger Harris had no knowledge the gun was there. While the Supreme Court has said that the Fifth Amendment prohibits an officer from interrogating an arrestee without reading that arrestee his so-called <u>Miranda</u> rights, the rule extends only to the functional equivalent of an interrogation. <u>U.S. v. McKenzie</u>,132 Fed. Appx. 788, 789-790 (11th Cir. 2005) (*citing* <u>Innis</u>, 446 U.S. 299). Voluntary statements-even those made without a <u>Miranda</u> reading-are admissible as long as they are given freely and voluntarily without compelling influences. <u>Id.</u> at 299-300; <u>Miranda</u>, 86 S. Ct. at 478. Neither Enderle nor Det. Sgt. Harris asked the Defendant any questions regarding the ownership of the gun found under the driver's seat. The Defendant's comments were made spontaneously and voluntarily without any interrogation by either officer upon seeing Enderle emerge from the vehicle with the firearm in his hand. Thus, it is

respectfully recommended the Motion to suppress the Defendant's statement that he owned the gun should be denied.

### *(5) Whether Race Played a Role in the Traffic Stops*

Although the Defendant did not address the issue of racial profiling in his memorandum of law, the issue was raised at the hearing. The Defendant presented two (2) African-American witnesses who were stopped on the same day as the Defendant. The Defendant's witnesses, Samikia Mike and Nickenya Bryant, were traveling U.S. 27 to Clewiston for the Brown Sugar Festival. (Tr.186:7-15, 189:2, 194:24-25, 195:1-2). The Defense also provided documentation of six (6) arrests of individuals, five (5) of whom were African-American and one of whom was white. (Def, Ex. E, Composite). Based on those numbers, the Defendant states the evidence should be suppressed because the Defendant was stopped because of his race.

Claims that similarly situated individuals have been treated differently on the basis of race arise under the Equal Protection Clause. *See* City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (holding that the Equal Protection Clause requires that the government treat similarly situated people alike). In order "[t]o establish an equal protection claim, a plaintiff must demonstrate that (1) 'he is similarly situated with other p [ersons] who received' more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest, such as race." Everett v. Marianna Police Dept., 2008 WL 222713 *5 (N.D. Fla. January 25,2008) (citing Jones v. Ray, 279 F.3d 944, 946-47 (11th Cir.2001) (quoting Damiano v. Florida Parole & Probation Comission, 785 F.2d 929, 932-33 (11th Cir.1986)).

To establish a discriminatory effect in a race case, the Defendant must show that similarly situated individuals of a different race were not prosecuted. U.S. v. Armstrong, 517 U.S. 456, 465,

116 S. Ct. 1480, 1487, 134 L. Ed. 2d 687 (1996). This requirement has been established in case law since Ah Sin v. Wittman, 198 U.S. 500, 25 S.Ct. 756, 49 L. Ed. 1142 (1905). Armstrong, 517 U.S. at 465.

To establish discriminatory effect in a race case, the Defendant must show people of another race violated the law and the law was not enforced against them. U.S. v. Bell, 86 F.3d 820, 823 (8th Cir. 1996). To show discriminatory purpose the Defendant must show the officer's decision to enforce the law was at least partially based on race. Id.

Here, the Defense presented only two (2) witnesses and pulled only six (6) arrest reports from May 3, 2008, without any comparison arrest figures for similarly situated individuals who were treated differently due to their race. It is significant to note there were over 250 traffic stops on May 3, 2008, during the GCSO traffic interdiction. (Tr. 166:25, 167:1 ). As noted above, ordinary equal protection standards govern claims alleging racially selective enforcement of facially neutral laws. Id. As applied to the instant case, to prevail, the Defendant would have to prove that Enderle was motivated by a discriminatory purpose, and that the stop had a discriminatory effect on the identifiable group to which the Defendant belonged. Id. Even though the Defendant showed that the individuals in eighty percent (80%) of the arrest records he pulled were African-American, he failed to show that out of the over 250 people who were stopped that white drivers with tinted windows and marijuana in their possession were not arrested or ticketed by Enderle. See Id. (finding no discrimination occurred even through one hundred percent (100%) of the individuals arrested for not having a bicycle light were African-American, because the defendant failed to show that white bicyclists also violated the statute but were not ticketed). In fact, contrary to the Defendant's argument, one of the six (6) arrest records pulled for that day by the Defendant demonstrated that

the GCSO arrested a white individual for the same crime as the African- American's who were arrested.

Furthermore, the Defendant failed to present any evidence that Enderle has acted in the past in any discriminatory manner. To show discriminatory purpose, the Defendant must prove that Enderle's decision to stop the vehicle was at least partially based upon the driver 's race. Id. Although the driver's side window was within legal limits, Enderle testified that he could not see the driver through the tinted window. (Tr. 36:17-19, 75:5-20). Therefore, Enderle could not have made a determination regarding the Defendant's race until the Defendant was pulled over. As a result, the Court respectfully recommends that Enderle's actions that day were not based upon a discriminatory purpose and the Motion should be denied on those grounds.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant's Motion to Suppress Evidence and Memorandum of Law (Doc. #21) should be **DENIED**.

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.**

**Respectfully Recommended** at Fort Myers, Florida, this ___14th___ day of January 2009.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record